**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

EDWARD P. SURMA,            )    CASE NO.   1:09-cv-1513
                                )
           Plaintiff,          )
                                )    JUDGE BOYKO
      v.                   )
                                )    MAGISTRATE JUDGE VECCHIARELLI
COMMISSIONER OF SOCIAL     )
SECURITY ADMINISTRATION,   )    REPORT AND RECOMMENDATION
                                )
          Defendant.       )

This case is before the magistrate judge on referral.  Plaintiff, Edward P. Surma ("Surma"), challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Surma's application for a period of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423 and 1381(a).  This court has jurisdiction pursuant to 42 U.S.C. § 405(g).

For the reasons set forth below, the decision of the Commissioner should be AFFIRMED.

I.  Procedural History

Surma filed an application for DIB and SSI on February 10, 2006, alleging disability as of July 31, 1999.[1]  His application was denied initially and upon

---

[1]  At the hearing, Surma's attorney moved to amend the onset date to December 12, 2004, and the ALJ granted that motion.

reconsideration.  Surma timely requested an administrative hearing.

Administrative Law Judge Dennis LeBlanc ("ALJ") held a hearing on October 24, 2008.  Surma, represented by counsel, testified on his own behalf at the hearing.  Bruce Holderead testified as a vocational expert ("VE").  The ALJ issued a decision on December 30, 2008, in which he determined that Surma is not disabled.  Surma requested a review of the ALJ's decision by the Appeals Council.  When the Appeals Council declined further review on May 13, 2009, the ALJ's decision became the final decision of the Commissioner.

Surma filed an appeal to this court on July 2, 2009.  Surma alleges that the ALJ erred because the ALJ (1) did not give sufficient weight to the opinions of Surma's treating physician and instead gave substantial weight to the outdated and unsigned opinions of State agency physicians; (2) failed to follow the Commissioner's guidelines in finding Surma not to be entirely credible; (3) failed to consider the entire record in finding Surma not to be disabled; and (4) failed to include all the limitations he found when he stated the hypothetical to the VE.  The Commissioner denies that the ALJ erred.

## II.  Evidence

A.    *Personal and Vocational Evidence*

Surma was born on February 4, 1967 and was 41 years old at the time of his hearing.  He has a high school education and has not worked since December 31, 2004.[2]

---

[2]  Surma reported that he has worked in the past as a telemarketer and a factory worker.  Transcript ("Tr."), pp. 333.

B.    *Medical Evidence*

Surma first visited Leonor M. Osoria, O.D., on January 9, 2009.  Tr. at 288.

Office notes indicate Surma had a 7-year old daughter and described Surma as a

recovering alcoholic with a history of migraine headaches with associated photophobia

and phonophobia, occasional marijuana use, and tobacco use.  He denied any previous

hospitalizations, surgeries, or transfusions.  The doctor diagnosed him as suffering from

hypertension and high cholesterol.

On April 13, 2005, Lakewood Hospital admitted Surma after he suffered a drug

overdose.  Tr. at 325-44.  Tests revealed the presence of opiates, PCP, Flexeril, and

alcohol.  The attending physician found Surma to be guarded and fairly

uncommunicative, giving brief answers to all questions.  The physician described Surma

as alert, guarded, and evincing a flat affect.  Surma reported that he was experiencing

stress and depression and denied that the overdose was intentional, although he

contradicted himself regarding whether he intended to kill himself.  Surma's mother also

reported that Surma had been stressed and depressed in the last few months.  His

mother also told the physician that Surma had been admitted to St. Vincent's Hospital

18 years ago after slitting his wrists, then was sexually assaulted three years later and

"has never been the same."  Tr. at 332.  Surma's psychiatric assessment stated that he

had been out of work for four years, rarely used alcohol, but drank a lot of coffee.

Surma was diagnosed as suffering from an adjustment disorder with depressed mood

and assigned a Global Assessmen of Functioning ("GAF") of 45.[3]  Lakewood Hospital

---

[3] A GAF of 41 to 50 indicates serious symptoms or any serious impairment in social occupational, or school functioning.

discharged Surma on April 16, 2005 with a followup at North Coast Clinic scheduled for the following week.

Surma visited Dr. Osorio on April 25, 2005 and complained of depression.  Tr. at 295.  He reported that he had attempted suicide and that he had been hearing voices. He denied any further suicidal ideation or hearing voices and reported that he would be undergoing psychiatric care.  Dr. Osorio prescribed Lexapro at 10 mg.,  a dose that was increased as Surma continued to complain of depression.  Tr. at 296.  In July, Surma reported to Dr. Osorio that he had been diagnosed as suffering from bipolar disorder, and in September he reported suffering from erectile dysfunction.  Tr. at 297-98.

Surma began treatment at Bridgeway, Inc. in June 2005.  Tr. at 251-54.  His treatment included counseling with Julie Mark, a licensed social worker, and periodic visits with Dr. J. Shanker.  Progress notes of his first session with Dr. Shanker on June 20, 2005 described him as having two children, a 10-year old son living with the child's mother and a 7-year old daughter living with him.  He and his daughter lived in a rented house with his girlfriend and her 17-year old daughter.  Surma complained of chronic depression, lethargy, and occasional paranoia.  His pastimes included fishing, going to the park, playing the bass guitar, and watching movies.  He brought with him an online survey that, according to Surma, showed he was bipolar.  He reported some periods of high activity and elevated mood, but these were the exception.  He reported high libido and pursuing sexual encounters with online contacts during these "up" periods.  Surma also admitted occasional marijuana and alcohol use and past cocaine use.  He also said that although he had friends in high school, he had none now.  Dr. Shanker diagnosed Surma as suffering from bipolar disorder, panic disorder, polysubstance abuse,

4

hypertension, high cholesterol, and personal issues with his girlfriend and family.  He assigned Surma a GAF of 40-45.[4]

Over the next several months, Surma reported both depressed and euthymic moods, some anxiety, and occasional sleep problems.  Tr. at 244-50.  In October, Surma reported a mild panic attack.  Although Dr. Shanker frequently observed a somewhat flat affect, Surma generally reported little depression for the remainder of 2005 through 2006, although he also reported experiencing some anxiety.  Tr. at 208-19, 235-43.  Surma also reported by 2006 that the antidepressant drugs he was using had helped a great deal.

On June 22, 2006, Todd Finnerty, a state agency psychologist, completed a Psychiatric Review Technique ("PST") evaluating Surma.  Tr. at 269-84.[5]  Dr. Finnerty found that Surma suffered from bipolar disorder, recurrent severe panic attacks occurring at least once a week, a gender identity disorder, and a substance addiction disorder.  Dr. Finnerty opined that Surma had moderate difficulties in maintaining social functioning;  mild restrictions of activities of daily living; and mild difficulties in maintaining concentration, persistence, and pace.  He also concluded that Surma was moderately limited in his ability to work in coordination with or in proximity to others without being distracted by them, moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and

---

[4]  A GAF of 31-40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.

[5]  Dr. Finnerty had previously partially completed a PST regarding Surma.  Tr. at 255-268.  A supervisor returned the PST as incomplete.  Tr. at 285-86.

to perform at a consistent pace without an unreasonable number and length of rest periods, moderately limited in his ability to interact appropriately with the general public, moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors, moderately limited in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and moderately limited in his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  He also found that Surma was not significantly limited in his ability to respond to changes in the work setting.  Dr. Finnerty failed to sign his evaluation; he instead typed his name into the space that he should have signed.

Surma began visiting Heather Ways, M.D., as his general practitioner in August 2006.  In September, Dr. Ways noted Surmac as complaining of bipolar disorder, hypertension, hyperlipidemia, shoulder problems, and headaches.  Tr. at 125.  Over the next year and a half, she treated Surma for a variety of physical ailments in addition to his hypertension and hyperlipidemia, including leg swelling, elevated glucose levels, and an abscess.  Tr. at 125-37.

On March 27, 2007, Surma visited Michael Durbin, a psychiatrist.  Tr. at 180-81. Surma reported that he still struggled with anxiety and that he was having some problems with his daughter.  He also reported that his current medications were working well and were without side effects and that he had not had suicidal thoughts in two years.  He did not want any changes in his medications.  Dr. Durbin noted that Surma "has quite a supply of Trazadone at home as he hardly ever uses this as a sleep aid." Tr. at 181.  Dr. Durbin diagnosed Surma as suffering from bipolar disorder in partial remission, rule out schizoaffective disorder; panic disorder in partial remission on

6

current medications; polysubstance abuse with sobriety for eight years; and occasional symptoms of gender identification disorder.  The doctor described Surma as "a pleasant man with no unusual behavior or speech patterns.  Mood seems fair, affect full range. No psychosis, good insight in judgment.  No suicidal or homicidal thoughts."  Tr. at 180.

Dr. Durbin added a diagnosis of schizoaffective disorder after Surma's visit on May 29, 2007 and noted that Surma's affect was still flat.  Tr. at 175-76.  Surma reported, however, that things were going well.  On August 14, 2007, Surma described himself to Dr. Durbin as doing well on current medications, with no new problems or side effects.  Tr. at 170-71.

On October 22, 2008, Dr. Ways completed an assessment of Surma entitled "Bipolar Disorder and Related Conditions."  Tr. at 359-60.  She noted that Surma suffered intermittently or persistently from anhedonia, psychomotor retardation, decreased energy, feelings of worthlessness, and had difficulty concentrating or thinking, thoughts of suicide, pressure of speech, flight of ideas, inflated self-esteem, decreased need for sleep, easy distractability, and involvement in activities with a high risk of painful consequences.  She also noted that he suffered from panic attacks that left him unable to function independently and suffered from recurrent and intrusive recollections of a traumatic experience that caused him marked distress.  These symptoms, according to Dr. Ways, resulted in marked difficulty in maintaining social functioning; difficulties in maintaining concentration, persistence, or pace; and repeated episodes of  deterioration or decompensation in work or work-like settings that caused Surma to withdraw.  Dr. Ways opined that Surma was moderately impaired in his abilities: to understand and remember short and simple instructions; to understand and

7

remember detailed instructions; to carry out detailed instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to make simple, work-related decisions; to maintain appropriate behavior and to adhere to basic standards of neatness and cleanliness; and to set realistic goals or make plans independently of others.  Dr. Ways also opined that Surma was markedly impaired in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes and was extremely impaired in his abilities to maintain attention or concentration for extended periods, to work in coordination with and proximity to others without being distracted by them, to complete a normal workday without interruptions from psychologically-based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately to changes in the work setting, and to travel in unfamiliar places or use public transportation. According to Dr. Ways, Surma could be expected to be absent from work about twice a month.

Surma visited Dr. Marlena Roman on November 27, 2007.  Tr. at 164-66.  Surma reported that he was doing "pretty good," with no persistent depression, although he was experiencing mild to moderate anhedonia and moderate anxiety.  He also reported chronic fears of being harmed.  Dr. Roman described him as unkempt, polite but somewhat timid, having diminished speech and psychomotor activity, association of thought within normal limits, no homicidal or suicidal thoughts, grossly intact cognition, fair to limited insight, fair judgment, fairly good control of psychosis, no depression, good control over panic, and no present side effects of medications.  Dr. Roman

8

recommended continuing current treatment.

*C.      Hearing testimony*

At the hearing on October 24, 2008, Surma testified that he did not believe that he was able to work a full-time job.  According to Surma, he suffers from severe depressive episodes and daily mood swings, panic attacks a couple times a month, and does not like to leave the house most of the time.  He also stated that he has trouble staying focused, does not get along with people, including co-workers and supervisors, has little motivation, and has trouble accomplishing even simple tasks.  He varies between having to sleep a great deal and being unable to sleep.  Surma also testified that his condition has stayed about the same since December 2004.  His daily activities, according to Surma, consisted of getting his daughter ready for school, watching television, and reading.  In addition, he sometimes goes to the store, occasionally visits the park with his daughter, attends doctor appointments about once a month, and rarely visits his parents or goes out with his girlfriend.  He has no friends.

Surma reported that he had been seeing Dr. Ways as his primary care physician since late 2006.  He testified that he saw her a couple of times a year unless he was ill and that he saw her for blood pressure, physicals, or if he was ill.  Dr. Ways did not prescribe medicine for Surma's depression, as that was done by his psychiatrist.

Surma also testified that although his counselor had suggested working as a bus driver or pizza delivery driver he had not followed up on these suggestions.  He does not get along with people because he has the feeling that they are talking about him behind his back, and he becomes argumentative with them.  Nevertheless, he said that he was able to talk to his daughter's teachers and to cashiers when he goes out with his

girlfriend without problems.  Surma also testified that he had tried to kill himself at least four times and that references to his being "stable" in the record meant that he was not hearing voices or motivated to kill himself.

The ALJ's hypothetical question to the VE asked the VE to assume an individual of Surma's age, education, and work background with a full range of exertional work except that the person was limited to understanding, remembering, and carrying out only simple instructions; was limited to only occasional interaction with co-workers and supervisors and no interaction with the general public.  When asked if there were unskilled occupations in the national, regional, or local economy for such a person, the VE said there were, including automobile detailer, cleaner, and laundry worker.  When Surma's counsel asked the VE whether there would be work for such a person who was also off task 15% of the day or who could not adjust to normal changes in the workplace, the VE said that there would be no work in either case.  When Surma's attorney posed the question of whether there would be work for the person in the ALJ's hypothetical if that person would be unable to come to work two days a month, the VE thought that such a person could work for the federal government but possibly not for private employers.  In any case, the VE did not provide a job that such a person could perform.

### III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable

10

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. Second,  the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

IV.  Summary of Commissioner's Decision

In determining that Surma was not disabled, the ALJ made the following findings:

1.      The claimant met the insured status requirements of the Social Security Act through December 31, 2004.

2.    The claimant has not engaged in substantial gainful activity since December 31, 2004, the alleged onset date.

3.    The claimant has the following severe impairments:  bipolar disorder, panic disorder, and schizoaffective disorder. . . .

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in  20 CFR Part 404, Subpart P, Appendix I . . . .

5.    After careful consideration of the entire record, the undersigned finds that the claimant is able to perform a full range of exertional work but is limited to understanding, remembering, and carrying out simple instructions; with occasional interaction with coworkers/supervisors; and with no interaction or dealing with the general public. . . .

6.    The claimant is unable to perform any past relevant work . . . .

7.    The claimant was born on February 4, 1967 and was 32 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date . . . .

8.    The claimant has at least a high school education and is able to communicate in English . . . .

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills . . . .

10.   Considering the claimant's age education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform . . . .

11.   The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2004 through the date of this decision

Tr. at 12-20.

V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence

in the record to support the administrative law judge's findings of fact and whether the

12

correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

Surma alleges that the ALJ erred because (1) the ALJ violated the treating physician rule in rejecting the opinions of Surma's treating physician and in using the outdated and unconfirmed state agency physicians' statements; (2) the ALJ failed to follow the requirements of SSR 96-7p and 20 CFR § 416.929(c)(3) in finding that Surma's allegations of disabling symptoms were not credible; (3) the ALJ improperly weighed the medical evidence by failing to examine the entire record in determining Surma's RFC; and (4) the ALJ failed to include all of Surma's limitations in his hypothetical question to the VE.  The Commissioner denies that the ALJ erred.

A.    *Whether the ALJ erred in giving greater weight to the opinions of the state agency physicians than to the opinion of Surma's treating physician*

Surma contends that the ALJ erred in rejecting the opinions of Dr. Ways, Surma's primary physician, regarding Surma's limitations in favor of the opinion of state agency psychologist, Dr. Finnerty.  The opinion of treating physicians should be given

13

greater weight than those of physicians hired by the Commissioner.  *Lashley v. Secretary of Health and Human Servs.,* 708 F.2d 1048 (6th Cir. 1983).  This is true, however, only when the treating physician's opinion is based on sufficient objective medical data and is not contradicted by other evidence in the record.  20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 & n.7 (6th Cir. 1991); *Sizemore v. Secretary of Health and Human Services*, 865 F.2d 709, 711-12 (6th Cir. 1988).  Where there is insufficient objective data supporting the opinion and there is no explanation of a nexus between the conclusion of disability and physical findings, the factfinder may choose to disregard the treating physician's opinion.  *Landsaw v. Secretary of Health and Human Servs.,* 803 F.2d 211, 212 (6th Cir. 1986).

When an ALJ determines that a treating physician's opinion should not be given controlling weight, the ALJ is required to give good reasons for rejecting that opinion. *Wilson v. Commissioner of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2); and SSR 96-2p, 1996 WL 374188 (S.S.A.).  In particular, "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  SSR 96-2p, 1996 WL 374188 at *5.

In the instant case, the ALJ wrote the following regarding the opinion of Dr. Ways:

Heather Ways, M.D., completed a questionnaire concerning the claimant's

14

mental impairments.  Dr. Ways concluded that the claimant had no restrictions of daily living; marked difficulties in maintaining social functioning; deficiencies of concentration, persistence, or pace; and repeated episodes of decompensation. The assessment of Dr. Ways received less than controlling weight, because it is otherwise inconsistent with substantial evidence and not well supported, as evidenced by the claimant's actual functioning in his daily life, as discussed below.  The state agency opinions in the record are more consistent with the extent of the claimant's daily functioning, and therefore, received greater weight.

Although he exhibits social withdrawal, the claimant has been able to deal with people when he has to such as his daughter's teachers, cashiers, and ordering food at fast food places.  The evidence also shows he uses a computer, reads, watches TV, listens to radio, helps his daughter with homework, takes his daughter back and forth to school on a regular basis, and has apparently gone fishing.  He has denied some activities at his hearing, but the evidence does not document any reason the claimant's progress notes would not accurately have recorded his report of activities in measuring his progress.

Tr. at 19 (citations omitted).

The ALJ noted that Dr. Ways' opinions were not well supported.  Indeed, they were not supported by objective medical evidence or clinical findings of any kind.  Dr. Ways opined that Surma had marked difficulties in maintaining social functioning.  Thus, the ALJ's observations regarding Surma's interactions with his daughter's teachers, cashiers, and clerks at fast food places and regarding Surma's helping his daughter with her homework are relevant to this opinion.  Because of the deficiencies in Dr. Ways' opinion and the evidence of Surma's activities, the ALJ's decision to give greater weight to the opinions of state agency physicians than to the opinion of Dr. Ways was supported by substantial evidence.

Surma responds that the ALJ should not have considered the opinions of state agency psychologist because those opinions were not signed.  Surma moved *in limine* prior to the hearing to dismiss Dr. Finnerty's opinions for this very reason, and the ALJ denied the motion.  As the ALJ noted, no rules of evidence governing the hearing

15

required consideration of signed documents only, some of the documents submitted by Surma and requiring a signature were not signed, there was no reason to believe that any of the unsigned documents in the case were not what they purported to be, and Surma did not allege that the documents were fraudulent or otherwise tainted.  Tr. at 9. While Surma argues that admission of the evidence was against the policy described in the Social Security Program Operations Manual System ("POMS"), Surma concedes that POMS is persuasive rather than mandatory authority.

Surma also notes that the opinion of the state psychologist was given in June of 2006 and argues that the opinion was, therefore, outdated.  This argument is not well taken.  The ALJ was considering, *inter alia*, whether Surma was disabled on or before December 31, 2004.  That Dr. Finnerty's opinion was delivered in 2006 rather than later does not detract from its credibility.

Finally, Surma contends that the ALJ substituted his own medical opinion for that of the physicians of record.  In particular, Surma notes that the ALJ found that Surma had moderate limitations in activities of daily living, moderate restrictions in social functioning, and moderate limitations in maintaining concentration, persistence, and pace.  Yet, the state psychologist found that Surma had mild restrictions in his activities of daily living, moderate restrictions in social functioning, and mild difficulties in maintaining concentration, persistence, and pace.  Dr. Ways found that Surma had no restrictions of daily living, marked difficulty in social functioning, and such difficulties in maintaining concentration, persistence and pace as to result in frequent failure to complete tasks in a timely manner.  In other words, Surma is objecting because the ALJ, having discounted Dr. Ways' opinions in favor of the opinion of the state

16

psychologist, found that Surma was more limited than the state psychologist's opinion indicated.

The ALJ is charged with using all the evidence in the record, including the opinions of physicians, in determining a claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1527(c)(2), 404.1546(c). As the ALJ gave Dr. Ways' opinion "less than controlling weight" rather than "no weight," the ALJ was bound to consider Dr. Ways' opinion along with Dr. Finnerty's opinion and other evidence in the record, in determining Surma's RFC. Finding that Surma's RFC was between the limitations described by Surma's treating physician and the state agency psychologist does not, of itself, amount to the ALJ's substitution of his own medical opinion for that of the opinions of the physicians on the record. Rather, it amounts to reaching an independent decision regarding the claimant's RFC, something that the ALJ is required to do.

For these reasons, Surma's contention that the ALJ erred in giving greater weight to the opinions of the state agency physicians than to the opinion of Surma's treating physician is not well taken.

B.    *Wether the ALJ failed to follow the requirements of SSR 96-7p and 20 CFR § 416.929(c)(3) in weighing Surma's credibility*

Surma asserts that the ALJ failed to perform the analysis required by SSR 96 7p in evaluating Surma's credibility. According to Surma, he has made the following statements regarding his symptoms:

> Surma testified that his symptoms have been consistent since 2004 (TR 381).
> He stated that he has significant trouble staying focused on tasks (TR 381). He
> also testified that he has trouble getting along with other people and that it is very
> difficult it is for him to leave the house (TR 380-381), Surma stated that when he
> is depressed he sleeps for hours on end, has little motivation, is irritable, and has
> trouble with even simple tasks (TR 382). He testified that when he is in a manic

17

phase, he will go for more than a day without sleep, spends money on shopping sprees, and attempts to pick up women or contacts prostitute (TR 393); he estimates that those periods occur about every two months (TR 382).  Surma did not deny that he tries to occupy himself by watching TV while at home, but he testified that he has not [sic] hobbies, does little housework, belongs to no social groups, and goes grocery shopping with his girlfriend despite having a hard time being in the public (TR 383-386).  He described having to run out of stores at times because he feels that others are talking about him (TR 388).  He has panic attacks when in public places and thus goes out "very rarely." (TR 389)  On occasion, he will take his daughter to the park, however (TR 389).  Surma testified that his medications have helped, but only to the extent that he hears voices less often and is not suicidal (TR 394).  He stated that he has been fired from most of the jobs he has held either due to "blowing up" at people or because he missed work when he could not get out of bed (TR 395).  He does not believe that he could hold down a full time job because his symptoms increase when he is under pressure or faced with deadlines of any type (TR 398-399).

Plaintiff's Brief on the Merits ("Plaintiff's Brief"), Doc. No. 15, pp. 12-13.  Surma

contends that because the ALJ did not examine all the factors required in making a

credibility determination, the evaluation of Surma's credibility was not supported by

substantial evidence.

In relevant part, SSR 96-7p, 61 FR 34483 reads as follows:

In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:
1.  The individual's daily activities;
2.  The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3.  Factors that precipitate and aggravate the symptoms;
4.  The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5.  Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6.  Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7.  Any other factors concerning the individual's functional limitations and

18

restrictions due to pain or other symptoms.

SSR 96-7p, 61 FR at 34485. Surma argues that the ALJ's analysis of Surma's credibility was only three sentences long. Moreover, Surma contends that: the ALJ looked only at daily activities in assessing Surma's credibility and ignored the other factors; his findings were not supported by the record; and his findings were not sufficiently specific to make clear the weight the adjudicator gave to the individual's statements and the reason for that weight.[6]

Surma's description of the ALJ's evaluation of his credibility is inaccurate. The ALJ's examination of factors related to Surma's credibility occupies about three and a half pages of the ALJ's opinion. *See* Tr. at 16-20.[7] The ALJ reviewed Surma's medical history, primary medications, and daily activities from February 2005 to April 2008. He also considered, and discounted, evaluations of Surma by family and friends. He then wrote the two paragraphs quoted *supra,* Tr. at 19. In the course of the ALJ's examination of the relevant facts, he considered Surma's reported daily activities, Suma's descriptions of his symptoms and what aggravates them, reports of those who have observed Surma, and the primary medications Surma takes for depression and

---

[6] Surma also argued that the ALJ failed to consider that he structures his activities to minimize his symptoms, as described in SSR 96-7p. SSR 96-7p lists that behavior as something that the ALJ should consider is assessing why a claimant fails to visit a physician as often as might otherwise be expected, not for any other purpose. *See* SSR 96-7p, 61 FR at 34488.

[7] This includes the ALJ's analysis of whether Surma has an underlying medically determinable impairment that could reasonably be expected to produce Surma's symptoms. That analysis includes examination of Surma's medical history, which is necessarily part of the determination of the limiting effects of Surma's symptoms, including the ALJ's assessment of the credibility of Surma's statements regarding those limitations.

anxiety.  The ALJ also noted that Surma had received counseling.

In finding Surma's statements regarding his symptoms to be not entirely credible, the ALJ noted that Surma was able to deal with his daughter's teachers, cashiers, and ordering food at fast food places without apparent difficulty and that the limitations he alleged at the hearing were contradicted by his physicians' progress notes.  While this explanation of the reasons for his conclusion might have been better developed, it is nevertheless substantial evidence in support of the ALJ's credibility determination.  As the ALJ's analysis of Surma's credibility comports  with the standards of SSR 96-7p and is supported by substantial evidence, Surma's arguments to the contrary are not well-taken.

C.      *Whether the ALJ failed to consider the entire record in determining Surma's RFC*

Surma contends the the ALJ erred because he selectively considered only those records that supported his conclusion, rather than the entire record, in determining Surma's RFC.  The Commissioner replies that the ALJ's determination of Surma's RFC was supported by substantial evidence.

Surma argues as follows:

The record is replete with records documenting that Surma received counseling and psychiatric treatment for years, was compliant with his medication, and yet his symptoms were never reliably under control.  A sampling of treatment notes from Bridgeway, where Surma received counseling for years demonstrate his ups and downs.  On 6/20/05, Surma was diagnosed with Bipolar Disorder and Panic Disorder, was noted to have "chronic depression" with symptoms of "lethargic, sad, wants to cry, with panic attacks a few times a month (TR 251-252).  His estimated GAF was only 40-45 (TR 254).  Three months later, on 9/12/05, he was noted to have a depressed mood with suicidal thoughts, and increased anxiety and jitteriness with recent panic attacks (TR 246).  On 11/16/05, Surma's medication compliance as noted, but he was having an increase in manic symptoms and ruminative thoughts, with increasing unease around others; a flat affect was noted. (TR 241).  On 3/20/06, Surma's

20

compliance with medication was again noted, but so was a "flat, odd" affect, as well as anxiety with some paranoia (TR 236).  By 3/27/07, it was noted that Surma's Biipolar and Panic Disorder was in partial remission with current medications, but he still struggles with anxiety at times (TR 180).  On 11/27/07 Surma presented as "unkempt," "timid and guarded," with "diminished spontaneous speech and psychomotor activity" (TR 164).  On that date he also had "moderate anxiety, mild to moderate anhedonia and constricted or blunted affect," as well as "vague fears of being harmed, chronic" (TR 164) .  He was diagnosed with Schizoaffective Disorder, Bipolar type and Panic Disorder at that time (TR 166). Approximately three months later, on 1/17/08, Surma was noted to have an unkempt appearance, diminished speech and psychomotor agitation, with constricted affect and mild to moderate anhedonia (TR 188).  The diagnoses of Schizoaffective Disorder, Bipolar type with Panic Disorder remained the same (TR 187).  On 6/25/08, it was noted that Surma has "self-esteem issues" and that he suffers from "mood swings" and "cycles into anger–triggers" (TR 114).

Plaintiff's Brief at 15-16.

The ALJ noted Surma's diagnoses of post traumatic stress disorder, chronic depression, bipolar disorder, bipolar schizoaffective disorder, panic disorder, polysubstance abuse, and also noted that Surma was troubled by low self-esteem and lack of confidence.  He also noted that Surma suffered, at times, from panic attacks, lethargy, sadness, irritability, anxiety, an inability to sit still, and sleep disorders, and noted reports that Surma had been feeling "a little manic" and was uncomfortable with a new person in the house.  Tr. at 17.  "Lethargy" is reasonably synonymous with "diminished spontaneous speech and psychomotor activity."  When those diagnoses and symptoms that the ALJ did, in fact, mention are removed from Surma's argument, the argument is left with the allegations that the ALJ failed to mention that Surma had an estimated GAF in June 2005 of 40-45 and suffered an instance of suicidal thoughts, an instance of increased manic symptoms with increased unease around others, two instances of unkempt appearance, two instances of anhedonia, several instances of flat affect, and one instance in which it was noted that Surma had vague but chronic fears of

being harmed.  Surma does not explain how the failure to note these facts deprives the ALJ's determination of Surma's RFC of substantial evidence, nor does he assert how the ALJ's determination of Surma's RFC might have been different in light of these facts.

The particular facts in the record that were not included in the ALJ's opinion were not so significant or so numerous as to warrant the conclusion that the ALJ selectively considered only those records that supported his conclusions.  Moreover, even when these facts are considered, the ALJ's opinion is still supported by substantial evidence.  For these reasons, Surma's contention that the ALJ erred because he failed to consider the entire record in determining Surma's RFC is not well taken.

D.      *Whether the ALJ failed to include all of Surma's limitations in his hypothetical question to the VE*

Surma contends that the ALJ's finding that there are a significant number of jobs in the national economy that he can perform is not supported by substantial evidence because the ALJ failed to include in his hypothetical question to the VE the ALJ's finding that Surma was moderately limited in his concentration, persistence, and pace.  The Commissioner responds that this limitation was part of the ALJ's analysis of the severity of Surma's medical impairments, not an assessment of Surma's RFC.  The Commissioner also asserts that because substantial evidence supports the ALJ's decision in any case, Surma's argument is unavailing.

The ALJ's findings included the following:  "[T]he claimant is able to perform a full range of exertional work but is limited to understanding, remembering, and carrying out simple instructions . . . ."  Tr. at 16.  The limitation to simple instructions addresses the moderate limitation on concentration, persistence, and pace in the ALJ's opinion.

Accordingly, the opinion of the ALJ is supported by substantial evidence in the record.

VII.  Decision

For the reasons given above, the decision of the Commissioner should be AFFIRMED.

Date:  April 21, 2010                    s/ Nancy A. Vecchiarelli
                                         U.S. Magistrate Judge

**OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111.**